After making the foregoing statement of facts, Mr. Justice Hagner delivered the of the as follows:
The first question presented in these cases is whether the order of 31st of July, 1888, was one that the Equity Court had authority to pass. It is insisted by those who maintain its legality that the justice was fully authorized to make such an order, upon consideration of the entire proceedings up to that time, comprehending not only the allegations of the bill, but the admissions of the answers and whatever else, by way of affidavit, or otherwise, then appeared in the cause.
It will be observed that the petition did not ask for such an order, but only prayed for a receiver, “according to the usages, practices, and rules of this court, as prayed for in the said bill of complaint.” The prayer of the bill for an injunction had already been passed upon ; and this was only a repetition of the other prayer, hitherto not acted upon, 'asking for a receiver, who should be authorized to collect from the Treasury of the United States said 30 per *458 cent., whenever the same should become payable, either to McKee or any other person, and pay over the same to the plaintiff and to others entitled thereto.
We are of opinion that in considering the validity of the order, we are confined to the examination of the bill alone; and that the answer, and everything that had occurred subsequent to the bill must be excluded from our consideration. I will refer to a few of the numerous authorities on this point. In Story’s Equity Pleading, section 257, it is said :
“ And this leads us to remark, in the next place, that every fact essential to the plaintiff’s title to maintain the bill and obtain relief must be stated in the bill, otherwise the defect will be fatal. For no facts are properly in issue unless charged in the bill; and, of course, no proof can be generally offered of facts not in the bill; nor can relief be granted of matters not charged, although they may be apparent from other parts of the Readings and evidence, for the court announces its decree secundum allegata et probata.”
And in section 264, “ The rule even proceeds further, for if an admission is made in the answer it will be of no use to the plaintiff, unless it is put in issue by some charge in the bill; and the consequence is that the plaintiff is frequently obliged to ask leave to amend his bill, although a clear case for relief is apparent upon the face of the pleadings. This would occur, for example, when a bill is brought againt an executor for an account, and it prays an account of the personal estate of the testator, but it does not charge any act of mismanagement or .misconduct in the executor, but simply charges that he has received assets. In such a case, although the answer should disclose gross acts of mismanagement and willful neglect or default, whereby assets had not been received, yet no decree for an account upon such matters could be obtained upon a bill so framed, for it would not be a matter in issue.” The author cites Gresley’s Equity Evidence, page 23. In *459 Jackson vs. Ashton, 11 Peters, 249, the Supreme Court said, “ No admission in an answer can, under any circumstance, lay the foundation of relief under any specific head of equity unless it be substantially set forth in the bill.”
But if we were at liberty to consider the statements of the answer in connection with the allegations of the bill, the ground for passing the order under examination would be much less tenable than that shown by the bill itself, since there is not an averment in the bill, from beginning to end, sustaining the plaintiffs’ claims, that is not flatly denied by McKee in his answer. Of course it would not be proper to separate the averments of the answer and rely upon a single admission, disconnected from all its other statements, and weigh that against McKee. In fairness, as in 'law, all parts of the answer responsive to the bill should be considered, and not an isolated part, and taking the entire answer, in connection with the averments of the bill, the case of the plaintiffs would be less favorable to them than if it depended solely on the bill.
We proceed to examine whether the averments of the bill disclose any ground for the exercise of equitable jurisdiction in the direction claimed. It was argued on behalf of the complainants that the bill invokes that jurisdiction upon the ground of the existence of an equitable lien in their favor. No such claim is made in the bill, in terms, and the word lien is nowhere mentioned. The bill is framed upon the idea that McKee had not yet drawn any part of the money, and its purpose ‘was to enjoin him from drawing the amount, and to obtain a receiver who should hold the fund for distribution. The principal object wras to prevent McKee from obtaining possession of the fund. The complainants rely principally upon paragraphs 27J, 28 and 29 of the bill as supporting their contention. The 29th paragraph charges that McKee had induced the Choctaw Nation to pass certain acts appointing him the agent of the said nation, to receive from the United States *460 any sums of money which might be appropriated to pay the judgment of the Court of Claims aforesaid. And that he has provided himself with apparent authority from the Choctaw Nation empowering him, m their name and behalf, to receive said moneys, and that he threatens to draw the money upon such warrants as -may be issued.
This supposal of the bill was altogether at variance with the existing state of facts upon which the order was passed, for that is based upon the idea that McKee had then actutually drawn out part of the money, and not as agent, but in his individual character.
In paragraph 27J the complainants, after denying the validity of McKee’s contract, aver that McKee and Blunt acquired no interest under the same (even if it was a valid contract) because it was therein stipulated that they should adjust the claims of all persons who had rendered services theretofore in the prosecution of the claims, and that, they had made no such adjustment, and that if these parties had any. interest under the contract (assuming its legality,) yet they were entitled to no such interest until they should first have adjusted said claims; and in the 28th paragraph it i's charged that McKee is bound in equity and justice to satisfy and paj7 over to Lamon the sum he advanced, together with just compensation for his services, as well as to pay the plaintiffs for the services rendered by them and Jeremiah S. Black during the existence of the partnership.
Unless an equitable lien is claimed in some part of these sections, it is claimed nowhere. There is no pretense of an attorney’s lien, and there is nothing in the facts out of which it could arise.
Assuming that we could sustain the present contention that an equitable lien can be considered as claimed substantially by the bill, when not charged in words, can we deduce such a claim from the language used? It is not enough to charge that a defendant owes a complainant money and had promised him to pay the debt out of a *461 particular fund, to justify an equity court to decree satisfaction of thé amount out of that fund. Chancery does not undertake the function of the mere collection of debts. On such an issue a defendant is entitled to trial by jury- and a chancery court interferes with that right only under particular circumstances, as'where an equity is shown to exist, growing out of a lien or trust. And such a lien must not only be alleged, but circumstances must be shown from which the court may be able to see that the allegation is justified by the facts set forth.
The Supreme Court has frequently announced its opinion upon this subject, and I will refer to a few of these decisions. In 21 Wallace, 437, the court says:
“The present case, notwithstanding the largeness of the plaintiff’s demand, is not different in its essential features from those cases of daily occurrence where the expectation of a contractor, that funds of his employer derived from specific sources, will be devoted to the payment of his services or materials, is disappointed. Such expectation, however reasonable, founded even upon the express promise of the employer that the funds shall be thus devoted, of itsélf avails nothing in favor of the contractor. Before there can arise any lien on the funds of the employer, there must be, in addition to such express promise, upon which the contractor relies, some act of appropriation on the part of the employer depriving himself of the control of funds, and conferring upon the contractor the right to have them applied to his payment when the services are rendered or the materials are furnished. There must be a relinquishment, by the employer, of the right of domain over the funds, so that without his aid or consent the contractor can enforce their application to his payment when his contract is complete.”
And again, in the case of Trist vs. Child in the same volume, it is said: “ It is well settled that an order to pay a debt out of a párticular fund belonging to the debtor gives *462 to the creditor a specific equitable lien upon the fund and binds it in the hands of the drawee. A part of the particular fund may be assigned by an order and the payee may enforce payment of the amount against the drawee. But a mere order to pay out of such a fund is not sufficient. Something more is necessary. There must be an appropriation of the fund pro tanto, either by giving an order, or by transferring it otherwise in such a manner that the holder is authorized to pay the amount directly to the creditor without the further intervention of the debtor.” See, also, Porter vs. White, 127 U. S., 344.
It is not in accordance with these decisions for a creditor to say that his debtor is insolvent, that he has learned he has a sum of money in a certain depository, and that he has promised again and again to pay the debt out of the very money, and has pledged his honor in the most solemn way to do so, to justify a court of chancery to lay hands on the fund. He must go further and show such assignment as amounts to an appropriation of a part of the fund. When this has been done the whole money does not belong to the debtor; for the part so assigned is the property of the creditor, and when this is made to appear it would be most unjust that the debtor who happens to have the right to draw the money should be allowed to do so, and retain it all to the prejudice of his creditor, the joint owner with himself.
We find no such state of case in the bill as can be recognized as a sufficient allegation of an equitable lien that a court ought to enforce. It is also urged at this hearing, that the jurisdiction may be maintained on the theory of a trust. The only sections in the bill that may be asserted to embody such a claim are those we have above referred to. Again, we remark that the word “ trust ” is not used in the bill. But if it had been used, or the idea had been embodied in other words, it would not be enough simply to assert the existence of a trust without a sufficient statement of facts to enable the court to determine whether the asser *463 tion that a trust existed was authorized under the light of the circumstances set forth in the bill. The law on the subject, as to the’ necessity of such allegations in a bill, is thus stated in the case of Van Weel vs. Winston, 115 U. S., 237. In that case a defendant was charged with abuse of a trust, with abundant expletives of abuse. The court says: “The bill is a long one, the allegations are not classified, nor the true foundations of relief very clearly stated. It is full of the words fraudulent and corrupt, and general charges of conspiracy and violation of trust obligations. Mere words, in and of themselves, and even as qualifying adjectives, of more specific charges, are not sufficient grounds of equity jurisdiction, unless the transactions to which they refer are such as in their essential nature constitute a fraud or breach of trust, for which a court of chancery can give relief.”
It seems to us, without now going more particularly into the examination of the particular language of the bill, that it is impossible to say there is such a charge of the existence of a trust made, or properly supported by accompanying statements, as would give jurisdiction to the court under this head of equitable relief. The charge in paragraph 29 that McKee had obtained from the Choctaws authority to draw the money, as their agent, and that he had provided himself with apparent authority, granted by the Choctaw Nation, empowering him to do so in their name and behalf, and that he threatens to draw the money, is the very opposite of any charge of such a trust on the part of McKee as is now insisted upon by the complainant in argument. Again, we were referred to the section of the contract in 1870 with McKee in which it is stated that Blunt and McKee are to adjust the claims of all parties who had rendered service theretofore in the prosecution of said claim. But we cannot perceive that this language in the contract, in the absence of any charge to that effect in the bill, when taken in connection with the language .of the act under which *464 McKee’s claim and duty were defined eighteen years after-wards, could be considered as a sufficient charge of a trust as against the fund in McKee’s hands to justify the court in assuming jurisdiction on that ground.
It might be questioned whether there was not a fatal fault in the alternative method of pleading adopted by the complainants in dealing with this contract in their bill. A plaintiff is not at liberty to claim that an instrument is fraudulent and void and then claim under it. He must decide beforehand whether he intends to claim under it or against it, and not to shift his position in the way attempted here. A suitor cannot be allowed to “to blow hot and cold ” after this fashion.
In the case of Morrison vs. Shuster, 1 Mackey, 194, creditors claimed the right to seize certain goods obtained by Shuster at a sale which they alleged was no sale, because conceived in fraud; .and afterwards claimed the proceeds of the goods, when sold by Shuster’s trustees; but the court refused to permit such contradictory claims. .
If McKee made a contract with the Choctaw Nation under which he agreed to pay these plaintiffs the money claimed, he might be held liable in an action at law, or the Choctaw Nation itself, by proper proceedings, might be forced to make good the default of their agent.
It is a principle of equity that a trust is never implied or presumed or intended by the parties unless, taking all the circumstances together, that is the fair and reasonable interpretation of their actions. 2 Story’s Equity, 1195.
In the absence of averment or proof of lien or trust, no jurisdiction existed in the Equity Court to pass the order, either upon the face of the bill or in connection with the averments of the answer considered with the bill.
It is not necessary to consider the other various objections made by the defendants to Cochrane’s contract — that it is a contract purely personal — that it was conditional upon his performance of the whole work; that it was void *465 under the Act of 1853, and that this suit is really one against the nation. All these questions will more properly arise after the order we are here considering. Our duty now is simply to decide whether, as the case properly appeared before the justice below, he had jurisdiction to pass the interlocutory decree, and we pause as soon as we have discussed the two objections we have been considering, sitting here just as the equity judge below would have done if he were reviewing his own decision on this particular order, we postpone, as he would have done, the consideration of the other questions referred to, which may more properly be discussed after the testimony has been taken, and content ourselves with deciding that the court below had no jurisdiction to make that decree, and that it should be revoked.
The next matter before us in this case is presented by an appeal by McKee from the order of Judge Cox, directing him to be committed for contempt in not complying with the decree requiring him to pay the money into court. A motion was made to dismiss the appeal. We think this motion must be sustained.
In Ex parte Fisk, 113 U. S., 718, the petitioner had been committed for contempt by the Circuit Court of the Southern District of New York for refusing to produce his books, memoranda and contracts, to afford the plaintiff an opportunity to prepare his case for trial. He applied to the Supreme Court for a writ of habeas corpus, and the court, after deciding that the Circuit Court had no authority to pass the order, says:
“The jurisdiction of this court is always challenged in cases of this general character, and often successfully. There can be no doubt of the proposition that the exercise of the power of punishment for contempt of their orders, by courts of general jurisdiction, is not subject to review by writ of error or appeal to this court. Nor is there, in the ¡system of federal jurisprudence, any relief against such *466 orders; when the court has authority to make them, except through the court making the order, or possibly by the exercise of the pardoning power. This principle has been uniformly held to be necessary to the protection of the court from insults and oppression, while in the ordinaiy exercise of its duties, and to enable it to enforce its judgments and orders necessary to the due administration of law and the protection of the rights of suitors. When, however, a court of the United States undertakes, by its process of contempt, to punish a man for refusing to comply with an order which that court had no authority to make, the order itself, being without jurisdiction, is void, and the order punishing for the contempt is equally void. It is well settled nowr, in the jurisprudence of this court, that when the proceeding for contempt in such a case results in imprisonment, this court will, by its writ of habeas corpus, discharge the prisoner. It follows, necessarily, that on the suggestion of the prisoner that, for the reason mentioned, the order under which he is held is void, this court will, in the language of the statute, ‘make inquiry into the cause of the restraint of liberty.’ ” See, also, Ex parte Ayers, 123 U. S., 485.
Under these decisions of the Supreme Court, this appeal will be dismissed. But as we have held the decree directing McKee to pay the money into court was without authority, for want of jurisdiction in the court, it results there could be no authority in that court to enforce obedience to that decree by proceedings as for a contempt.
The party against whom an attachment has been issued, not having the right to procure its rescission by an appeal from the order, must present his grievance in some other manner. In this cause the order for an attachment against McKee for alleged disobedience to the injunction forbidding him to draw the money from the Treasury, was revoked upon a motion made before the justice who ordered the attachment. In the two cases above cited, and in Ex parte *467 Terry, 128 U. S., 289, and in Ex parte Savin, the matter was brought before the court by petition for a discharge oh habeas corpus. The order in the case of Bradley, who was disbarred for a contempt by a justice of this court, was reviewed upon an application for a mandamus.
As this cause is to be remanded, the court below, upon notice of this decision, will of course set aside the order for the attachment.
The next question presented in this case arises on the appeal of James R. Doolittle, from the order of the court refusing to admit him as a party defendant. On the 9th of September, 1889, this- motion was filed in the Equity Court, unsupported by any explanation or affidavit.
“ Now comes James R. Doolittle, by his solicitor, and moves the court for leave to be made a party defendant in the above entitled cause, and for leave to file an answer therein.” On the 11th the judge passed an order that the motion be denied and overruled. On the 27th of that month an unsworn paper purporting to be Doolittle’s answer to the bill was marked filed, sixteen days after the judge had decided that he could not be admitted to come in and file an answer. It could, therefore, have furnished no support to the motion, which should be by petition verified by affidavit, showing why the applicant has a right to come in and be made a party.
Indeed, upon the authorities, the right of a person to come in, as a matter of course, is one admitting of very grave doubt, and the courts when confronted by an objection from the parties have frequently declared no such right exists. Gregg vs. B. & O. R. R. Co., 14 Md., 140; Shields vs. Barron, 17 How., 145; Lewis vs. Darling, 16 Id., 8.
A complainant proceeds without all proper parties at his peril, for his bill will be dismissed or remanded by the appellate court for amendment-, requiring new parties to be made, if it appears such have been omitted. The justification pleaded in this case for the application is that Lamon, *468 in paragraph 29 of the bill, avers that other persons than those above mentioned claim to have rendered services in the prosecution of the claim under such circumstances as to give them a right to a portion of said funds. That the plaintiffs are not able to state the nature of those claims, or to give the names of such persons, but they pray leave “when they shall have discovered the said persons that they may be allowed to make them parties hereto, and to insert herein in apt words setting forth the claims of such persons as these 'plaintiffs may be informed, in order that all such claims may be fully and finally determined and settled in this cause.”
And it is said that this is an assent by the plaintiffs to the admission of Doolittle as a party. But the plaintiffs in that paragraph expressly reserve the right, of themselves, to make such parties by amendment of their bill, which is quite a different thing from the contention in behalf of Doolittle, that persons can come in without any action on the part of the complainant. Without deciding more than that the application before us is wholly insufficient in form to justify the leave asked, it is evident the order denying the motion is not an appealable order. Parties only can appeal, and Doolittle is not a party to this cause. Strangers to the proceeding can have no such right, and Doolittle’s complaint, which he asks us to hear is, that the court would not admit him as a party.
We come now to the case of McKee against the widow and the executor of JohnT. Cochrane; Luke Lea; Gilfillan and Rawlings; the executors of Thomas A. Scott, Chauncey F. Black and Ward H. Lamon; and Latrobe, Stettauer, and Jacoway.
This bill was filed on the 20th of July, 1888, after McKee had drawn from the Treasury 25 per cent, of the money sought to be enjoined in case 11,238, as well as the $14,410. It alleges that from the 16th day of July, 1870, McKee had been the agent and attorney of the Choctaw Nation in the *469 prosecution of its claim against the United States under á contract between said nation, Blunt and himself, securing to them 30 per cent, of what should be recovered, as compensation for their services ; that as the fruit and result of his services, in accordance with a decision of the Supreme Court, he recovered judgment against the United States for $2,981,247.30; that to secure payment of 30 percent, of that amount for his services, the Choctaw Council passed an act, approved February 25, 1888, which stated at length McKee’s connection with the claim in 1870; that he and Blunt prosecuted the claim until Blunt died, when McKee associated with himself Luce and other able 'lawyers to assist in its prosecution ; that at the request of McKee the nation entered into a separate contract with Luce to pay him 5 per cent, of the amount recovered, which McKee stipulated should be credited upon the 30 per cent, previously secured Blunt and McKee; that McKee, by means of his own labors, and the aid and assistance of others, having recovered the judgment in favor of the nation, and fully performed his contract, became entitled to receive the sum in said contracts agreed to be paid; and in order to pay McKee and Luce the act made an appropriation for the payment out of said judgment of 5 per cent, of the amount to the representatives or assigns of John B. Luce, and 25 per cent, to the said McKee. The act further recited that two acts of the general council had been passed, requiring Le Flore to make such payments, and declared that it should be the duty of the treasury of the nation to make requisitions in favor of said McKee and Luce for the payment of said sums; and if the appropriation by Congress should be so, made that the money can only be paid into the treasury of the Choctaw Nation, then it was made the duty of its treasurer to draw the requisite drafts to pay said money. Section 4 directed that the sum of $14,140, acknowledged to be due to John T. Cochrane, by act of the general council of November 1, 1861, should he paid to *470 McKee in the s'ame manner and at the same time the 25 per cent, should be paid to him.
Section 5 provided “that the payment therein directed to be made shall, when made, either under this act or said other two acts hereinbefore referred to, be taken and accepted as full and complete payment, and final discharge and satisfaction of all the contracts and obligations of the Choctaw Nation to any and all attorneys for services rendered to the nation in the prosecution of said claims against the United States.”
The bill further alleged that an act of Congress was passed appropriating an amount sufficient to pay said judgment and interest, which was to be paid out upon requisition of the properauthorities of the nation, and in obedience to the act McKee drew from the treasury $714,699.65, with interest, together with the $14,140 ; that McKee and the representatives of Blunt claim no personal title or property interest in their own right in the 5 per cent, stipulated in the contract to be paid to Mrs. Cochrane out of the 30 per cent., nor does he claim any interest in the $14,140; that said 5 per cent, from said 30 per cent, amounts to $147,057.63, which, added to the $14,140, makes a total of $161,197.63, which the complainant offered and tendered to bring in and deposit according to the order of the court, the same to be disposed of under its future decree. McKee averred that Ellen Cochrane claims the said 5 per cent, as the widow of the said John T. Cochrane, and especially in virtue of the provisions of the said contract of the 16th of July, 1870; that McPherson, as executor of John T. Cochrane, claims the said 5 per cent, and also said $14,140, alleging that the 5 per cent, was secured by the stipulation in said contract for services rendered to said nation, and that said sum should not be paid to the widow, but to the estate; that Luke Lea, in the interest of his assignees, claims a portion of said 5 per cent., and the said $14,140 by virtue of a provision in the last will of the said Cochrane.
*471 That James Gilfillan and John A. Rawlings claim the payment to them of the moneys declared to belong to Lea, by virtue of an assignment from him and of alleged authority held by them from Cochrane’s executor; that the executors of the Scott estate claim $75,000 out of the 5 per cent, for their services under certain contracts, referred,to in the bill; that Lamon and Black claim an interest in the 5 per cent, and in the $14,140, and in support show contracts between Cochrane and the nation, and between Cochrane’s executor and Black; that the claim, set up by Chauneey F. Black to said 5 per cent., and $14,140, is in virtue of his alleged partnership with his father at the date of said contract, and of alleged services by his father and his alleged co-partners under said contract; that the claim of Lamon is based in part upon his co-partnership with Black, and the services rendered by Black and himself under the contract, and also upon the alleged fact that he refunded to Scott $25,000 of the $75,000 alleged to have been advanced by Scott; that Latrobe claims by virtue of certain alleged contracts, and also represents that he rendered independent services in behalf of the nation. The bill also gives McKee’s understanding of the nature of the claims of Stettauer and Jacoway; and further states the complainant is informed that other persons whose names are unknown to him, assert and make claims to some part of the money, but the nature, character and extent of such claims are not known to him; “ and he prays leave, whenever the names of such parties, and the extent, character and interest asserted by them become known to him, to make such parties defendants by proper amendments. That as to the 5 per cent, and the $14,140, in which he claims no interest in his own personal right, he cannot safely or properly undertake to determine or adjudicate, as between the said conflicting claimants to the fund, which of said claimants is entitled to said money or portions thereof; nor does he admit the truth of the allegations set forth by said claimants in support of their several claims; ” that the claims set up by *472 Black and Lamon are not limited in amount to 5 per cent, and the said $14,140, but their claim exceeds in amount the sum tendered, and includes a large part of the money belonging to the complainant and drawn by him from the Treasury; and the same may be true of the claims of others of the defendants; that neither the claim of Lamon, nor Black, to any part of the money, other than the money tendered, has any foundation in right or equity; nor has either of the defendants any right or claim to any part of the fund not therein tendered to the court, but that the entire residue of the same belongs to him.
He further states and asks that his bill may be regarded as a bill in equity in the nature of a bill of interpleader; tenders the said portions of the money in which he claims no interest to abide bj1' the order and decree of the court in the premises. He prays the defendants maybe required to discover what right or title they claim to the money tendered, and how they derive and make out their claim to the same; and that they may set forth to which of them the said moneys so tendered, and each and every part thereof, do of right belong and are payable, and that the defendants may interplead as to their rights to said fund; and further, that as to the money not tendered and drawn by the complainant from the Treasury, he may be adjudged and decreed to ‘be entitled thereto in his own right; and further, that the defendants may be restrained and enjoined from prosecuting any other claim against him. ■
Answers were filed by different defendants, and among others, by Gilfillan and Rawlings, as the assignees of Lea.
The last named defendants afterwards filed their cross-bill, to which McKee demurred, upon the ground, among others, that a cross-bill would not lie to a bill of interpleader. This particular objection was overruled by the court below, which decided that McKee’s bill was not a pure bill of interpleader, because the complainant therein prayed the court to decide that all of the money which he drew, except *473 the $161,000, should be held to be his own money, such a claim being inconsistent with the idea of a bill of inter-pleader, the theory of which is that the complainant stands as a disinterested stakeholder, claiming no affirmative relief. But the court sustained the demurrer upon other grounds and dismissed the cross-bill, and from the order of dismissal an appeal was taken. The propriety of this order depends upon the question whether the cross-bill presented a proper case for equitable relief.
Justice Story states the principles applicable to the subject thus: “A cross-bill, when it seeks relief, which is of an equitable nature, should also contain all the necessary allegations which confer an equitable title to relief upon the party, for otherwise it will be open to a demurrer.” Story’s Equity Pleading, Sec. 630.
That cross-bills are not favored is well settled. 13 Howard, 69.)
In the cross bill, Gilfillan and Rawlings allege that the contract between Cochrane and the delegates of the nation was recognized by the Choctaws as one that was not to terminate, as ordinary contracts would, on the death of the attorney, but was intended by the Choctaws to continue until the collection of the claim ; that the agency of Cochrane was coupled with an interest; that it was agreed the claim was to be prosecuted by the “ heirs and assigns ” of Cochrane even after his death, and by such attorneys as might be employed by him or them; that the Choctaws, in making the contract with Cochrane, annulled all previous contracts, and in afterwards approving the contract with Black they recognized the continued existence of the Cochrane contract; that the McKee contract was secured by deception on the part of McKee, in so far as it limited the amount due under the Cochrane contract to 5 per cent, of the 30 per cent.; that• Gilfillan and Rawlings employed counsel and aided and assisted McKee in his efforts to recover said claim at the request of the-Choctaws, all the *474 time laboring under the belief that McKee was also acting under the Cochrane contract, as McKee concealed its existence and made no objection to the aid and assistance of the complainants or their attorneys and counsel; and that they did not discover that such contract had been made until the case was before the Court of Claims, when McKee for the first time objected to the appearance of complainants as attorneys and made known the existence of said fraudulent and inequitable contract; that McKee obtained said contract by misrepresenting the extent of the services of Cochrane, and stated to the delegates that those interested in the Cochrane contract would be satisfied with the 5 per cent, provision; that Cochrane in his life-time had procured the submission of the Choctaw claim to the Senate of the United States, and the award and the partial appropriation of $500,000; that the sum of $14,140, as McKee well knew, was the result of the labors of Cochrane for work done prior to 1861, and was in part for recovering and collecting money in 1861, for which Cochrane was never paid a cent; and they insisted that the whole amount received by McKee was a fund for the purpose of paying all attorneys for services rendered, and especially the complainants, and that McKee was not. a proper party to disburse the amounts and to fix the sums due to claimants; that besides the half of the $14,140 and the 5 per cent, on the amount collected, which McKee should at once have paid over to Rawlings and Gilfillan, the balance should have been paid into court to await its adjudication and proper distribution: and they allege that the conduct of McKee as to the complainants was fraudulent; that they are entitled to a moiety of $14,140, and one-fourth or more of the 30 per cent, on the balance of the amount collected by McKee.
They deny the claims of everybody else, insisting that Black’s and Lamon’s claim has no foundation in justice or law, and that none others of the parties, except McPherson, executor, and Mary Magruder, a legatee, and Ellen Coch *475 rane, the widow of John T. Cochrane, and the complainant, have an}' interest in the fund.
They pray the court will adjudicate the rights of all parties interested, and will at once order the payment of the moiety of the $14,140 over to them, and the moiety, or whatever balance of the fund may be in court; and that an account may be taken, showing what is the proper proportion of the 30 per cent, due to them ; and that they may have a decree against McKee for the balance due; and they , ask for the appointment of a receiver for the trust.
There is no allegation that the money appropriated by Congress is impressed with an equitable lien in their favor, nor any claim of any deferred amount as due to them ; nor that Lea had ever been employed by the Choctaw' Nation or by McKee ; or that Gilfillan and Rawlings were so employed, or were named in any contract with the nation; or that there was any performance of Cochrane’s contract, under which they claim. These are some of the omissions of essential matters, all or some of which are requisite to establish a claim to the relief sought.
Without pausing to discuss them at length, it is enough, to say that after a careful consideration of all the averments of the cross-bill, we have arrived at the conclusion that it sets forth no such case of equitable lien or trust in favor of complainants as would justify the interposition of this court True it is, a trust is alleged to exist in so many words, but we repeat, it is not enough simply to allege the existence of a trust; the facts supporting the allegation must be sufficiently set forth; and this is not done here; or if a lien is relied on it must be shown that it is of such a nature as amounts to a distinct appropriation of the money to the plaintiffs. The fact that they claimed the 5 per cent, which is also claimed by Mrs. Cochrane, as well as the $14,140, in whole or in part, had clearly been set forth by McKee in his bill and in their anwer, and no cross-bill was necessary to enable them to insist upon those pretensions. *476 They insist their further claim for services rendered by Luke Lea, and by themselves as his assignees, in the prosecution of the Choctaw claim, is secured by a trust in their favor under section 5 of McKee’s contract, which declares that Blunt and McKee agree to adjust the claims of attorneys for services heretofore rendered. This contract was dated July, 1870. Gilfillan and Rawlings explicitly say that their services were rendered to assist McKee, but as McKee did nothing for the nation and was not employed until 1870, and only agreed to adjust the claims accrued before that date, the services rendered to assist McKee, which must have been performed after July, 1870, and could not come within the terms of that agreement. Whatever claim they may have against the Choctaw Nation for services after 1870, may be asserted at law; and if they have a claim against McKee it may be enforceable in the same way, but not under the cross-bill.
We refrain from deciding upon the other defenses made to the cross-bill; as, that the Cochrane contract was personal in its character, so that no power or right under it can devolve upon his assignees or heirs; that it was .an entire contract, dependent upon the complete performance by Cochrane of his obligations under it, and that all claim under it perished with Cochrane’s death, leaving the work incomplete; and the contract itself does not give any ground for action in a court of equity, because it is within the prohibitions of the Act of 1853. All we propose to decide now is that the cross-bill, upon its face, contains no proper allegations to sustain the jurisdiction of this court. If we were to express an opinion upon the other questions above'referred to, our decision would bind this court through the whole progress of this litigation. And no appeal would lie by any of the parties to the Supreme Court from an order dismissing the cross-bill, because it would not be in the nature of a final order. Ayres vs. Carver, 17 How., 598. It would thus be an injustice to the other parties who have *477 not joined in the cross-bill, if we should undertake at this stage of the case, while testimony is being taken, to decide the entire case.
The order dismissing the cross-bill will be affirmed for the reasons stated.
After the court had decided that a proper cross-bill would lie to McKee’s bill upon the ground that it was not a pure bill of interpleader, McKee asked leave to amend his bill, and on the 21st of May the justice below gave him leave to strike out so much of the bill as made Luke Lea a defendant ; to strike out the twenty-second paragraph of the bill; and also to strike out so much of the prayer of the bill as asks that as to the money, in excess of the $161,000 tendered in court, it might be adjudged and decided that the complainant was entitled thereto in his own right. After this leave had been given the following motion was'filed:
Ward Lamon being duly sworn, says:
“That on the 21st of May, 1889, certain amendments were made to the bill of complaint, by leave of the court first had and obtained; that the amendments so made to said bill make it necessary for the defendant to amend his answer heretofore filed, as he is advised by counsel that the proposed amendments of his said answer are fully set forth in the paper this day filed by him, and that he is advised by counsel, and verily believes that the amendments of his said answer, as proposed, are necessary for the protection of the rights of this affiant in this litigation, and that he cannot safely proceed to the trial of this cause without amending said answer as proposed by him.”
The answer of Lamon to the amended bill had been filed four days before his motion was made.
The court passed an order denying the motion for leave to amend his answer, and from this order Lamon has appealed. We think the justice below was right in refusing to permit the amendment. It is a well séttled principle of chancery law that courts are much stricter in allowing *478 amendments to answers than to bills, and it is only upon a very strong case and special circumstances that leave to amend an answer will be allowed. 1 Bland, 162.
Our rule 53, of' the equity rules, provides that an answer may be amended, as of course in any matter of form, as by filling up a blank, or correcting a date, or reference to a document, or in any other small matter, and be resworn at any time before replication or before the cause is set down for hearing upon bill and answer. But after replication, or such setting down for hearing, it Shall not be amended in any such matter’ without leave of the court; nor in any material patters, as by adding new facts or defenses, or qualifying, or altering the original statements, except by special leave upon motion and cause shown after due notice to the adverse party, supported, if required, by affidavit.
It is very plain from these provisions the court intended to observe strictness in the making of amendments. Unless the court should restrict the leave to amend answers it would frequently happen that after a defendant has filed his answer under oath, he might take advantage of some subsequent development in the case, and change his answer by the introduction of new matter and different defenses, even after issue joined and testimony taken, to the great delay and expense of the other parties. Mr. Lamon states that the amendments to the bill of complaint have made it necessary for the defendant to amend his answer. The first amendment to the bill was simply to strike out so much of the thirteenth paragraph and of the prayer as referred to Luke Lea and made him a party. There is nothing new in that requiring an amendment of Lamon’s answer. The next amendment was to strike out the twenty-second paragraph. How the striking out of that paragraph can render it necessary for Lamon to say anything additional to his answer we cannot very well see. It might have furnished a ground for an application to strike out his answer to the twenty-seventh paragraph, but not for *479 adding something to it. We have examined paragraph twenty-two, as it stood in the bill originally, and can perceive no reason why its omission by the amendment can render it necessary that Lamon should be allowed to add several pages of new matter to his answer because McKee, to the extent of that paragraph, has limited the scope of his bill by its omission. Especially would Lamon’s amendment be improper in view of the character of the amendment, as disclosed by the proposed answer.
We see nothing in the cause shown, why this exceptional privilege should have been given, and we think the justice below properly exercised his discretion in refusing the application.
Lamon also presented an appeal from the interpleader decree without assigning any particular reasons in its support. We do not think the decree obnoxious to any of the objections made at the hearing here. It recites the former proceedings and declares that the bill of interpleader as amended is properly filed, and directs the defendants to interplead and adjust between themselves their respective rights or claims to the money paid into the registry of this court by the complainant with his bill. And it further orders and decrees that the defendants named in the complainant’s amended bill should be perpetually enjoined and restrained from instituting or prosecuting any action or proceeding either at law or in equity, against said complaint for the recovery of the money so paid into court.
The object of filing the bill was that he might not be harrassed by all the complainants in conflicting suits which might be brought in respect of that decree by the different claimants. The decree further provides that the complainant, having brought that money into court, should be dismissed as a party to that suit. A complainant in a bill of interpleader has no right to be dismissed, unless the case is at issue. But when that stage has been reached, he has the right to ask such a decree. The very object of such a bill *480 is to obtain leave to deposit the money and allow the con test to go on between the rival claimants. But such a decree should not acquit him of accountability for any other moneys he may have received; and accordingly the decree below, while declaring the complainant be dismissed as a party to this suit, with his costs, further ordered that the decree was made without prejudice to the right of any and all of the defendants to institute any action at law or in equity to recover from the complainant any demands any of them may have for amounts due from him over and above the money so paid into court. And it further ordered that the respective answers of the defendants already filed in this cause should be taken and considered as the inter-pleading previously decreed.
We think the decree was a proper one, justified, as far as we can see, by the facts as disclosed at that time, and it is affirmed.
A motion was made by Doolittle in this case for leave to be admitted as a party, which was denied. Wé have decided in the previous case this was not an appealable order, and the appeal will be dismissed.
The same disposition must be made of the appeal from the order below, appointing Mr. Ingle as examiner to take testimony as to the proper disposition of the $14,400. This was clearly a matter within the discretion of the court, and from it no appeal lies. We can see no objection to the order, which, so far from delaying the cause, as was argued, may have the effect of expediting it.
We will sign a decree according to the principles of this decision.
The Chief Justice dissents from parts of this decision.